**STOCKMAN NATIONAL LIFE INSUR-
ANCE COMPANY**

v.

**UNITED STATES of America.**

**Civ. No. 70–101W.**

United States District Court,
D. South Dakota, W. D.

Nov. 2, 1971.

George A. Bangs, Rapid City, S. D.,
for plaintiff.

William F. Clayton, U. S. Atty., Sioux
Falls, S. D., for defendant.

BOGUE, District Judge.

Stockman Life Insurance Company
was organized in South Dakota in 1959
to engage in the business of underwrit-
ing policies of life, health and accident
insurance. In 1964 a merger took place
and the name was changed to Stockman
National Life Insurance Company (here-
inafter known as Stockman).

Denver National Life Insurance Company (hereinafter known as Denver) was a similar insurance company located in Colorado. On May 15, 1965, Stockman acquired all of the assets of Denver in exchange for 609,925 shares of its own common voting stock. This acquisition qualified as a tax-free exchange under Section 368(a) (1) (C) of the Internal Revenue Code of 1954. The stock given to Denver in the transaction represented 23.6 percent of the fair market value of all of Stockman's outstanding shares. The stock received by Denver in the exchange was not distributed directly to Denver's stockholders, rather it was held by Denver which thereupon ceased to do business as a life insurance company and changed its name to Denver National Financial, Inc.

This transaction was presented to and approved by 66⅔% of the voting shares of Denver. The agreement for the exchange between Stockman and Denver provided that Denver would furnish to the Stockman management a proxy covering the entire block of 609,925 shares and that the Stockman management would in turn support Denver's nominees for a certain percentage of the board of directors of Stockman. At the subsequent annual meeting in 1966, Denver nominated and elected, pursuant to the agreement, five members of a twenty-one man board of directors.

In 1967, National Western Life of Austin, Texas, purchased the Stockman shares from Denver with its own shares, which were then distributed to Denver's shareholders in a complete liquidation of Denver.

Among the assets acquired from Denver was a net operating loss allegedly valued at $929,224. This figure has not been agreed to by the defendant, but the amount need not concern the court in this lawsuit.

■ The sole issue is whether Stockman is entitled to the benefit of certain operation-loss carryovers under Sections 269, 381 and 382 of the Internal Reve-

nue Code by virtue of its acquisition of Denver.

Section 269 provides in essence that the Commissioner of the Internal Revenue may disallow a deduction, credit or other allowance which is acquired by any person or corporation for the purpose of tax avoidance or evasion. Section 381 defines the circumstances under which an acquiring corporation may utilize the tax attributes of an acquired company. Section 382 sets forth the limitations upon such transactions so as to prevent abuse of Section 381.

Preceding the enactment of these particular provisions it was common practice for a successful company to actively seek out and buy the assets of a company with a tax loss deduction. In fact, a company with a net operating loss capable of being carried forward for future years had an intangible asset of considerable value. The profitable business would then merge with the unprofitable business and utilize the loss carryovers of the loss business to offset the future profits of the profitable business.

■ To terminate the active solicitation and dealings in tax deductions, Sections 269, 381 and 382 of the Internal Revenue Code were passed. The Congressional Committee Reports indicate that Section 269 was "designed to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability." H.R.Report No. 871, 78th Congress, 1st Session (1943) 49.

The legislative history of Sections 381 and 382 are in volume 3 of the United States Code Congressional and Administrative News 83rd Congress (1954) 2nd Session. The House Ways and Means Committee Report exhibited the intent of the enactment when it stated:

"The new rules enable the successor corporation to step into the 'tax shoes' of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist un-

der court-made law. Tax results of reorganizations are thereby *made to depend less upon the form of the transaction than upon the economic integration of two or more separate businesses into a unified business enterprise.* At the same time the new provision makes it difficult to escape the tax consequences of the law by means of a legal artifice such as liquidation and reincorporation or merger into another corporation." U.S. Code Congressional & Administrative News, Vol. 3, 83rd Cong. 2nd Session (1954), page 4067. (Emphasis added.)

In discussing Section 382 the Senate Committee stated that:

"In addition, the section contains a new limitation on net operating loss carryovers in those corporate reorganizations described in section 381. This provision reduces the net operating loss carryovers of either the transferor or acquiring corporation *unless there is a 20 percent or more continuity of interest in the resulting corporation retained by the stockholders of the corporation with the net operating loss carryovers.*" U.S.Code Congressional & Administrative News, Vol. 3, 83rd Cong. 2nd Session (1954) p. 4923. (Emphasis added.)

In determining whether the loss carryovers should be allowed the court feels best advised in basing its decision "upon economic realities rather than upon such artificialities as the legal form of the reorganization." United States Congressional & Administrative News, Vol. 3, 83rd Cong. 2nd Session (1954), p. 4683. The intent of the legislation was clearly to stop the trafficking of net operating losses.

The Commissioner of the Internal Revenue has approached this area by promulgating the following regulation:

"The stockholders (immediately before reorganization) of a transferrer-loss corporation shall not be regarded as owning, immediately after the reorganization, any stock of the acquiring corporation which is not distributed to such stockholders pursuant to the plan of reorganization." IRC Regs. § 1.382(b)–1(a) (2).

It is the defendant's contention that each shareholder of the loss corporation must receive stock on an individual basis from the acquiring corporation.

It is the plaintiff's contention that it complied with the spirit of the statute and that the stockholders of Denver received their shares and chose to keep those shares in a block for voting purposes. The plaintiff asserts that the law should make no distinction between their method of handling the transaction and a plan whereby the shares in Stockman would have been given directly to the individual stockholders of Denver and they would have put their stock in a voting trust. The substance of the transaction should rule over the form.

■ Treasury regulations must be sustained unless it is unreasonable and does not consistently interpret the statute. Fawcus Machine Company v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931). Commissioner of Internal Revenue v. South Texas Lumber Company, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948). Whirlwind Manufacturing Company v. United States, 344 F.2d 153, 156 (5th Cir. 1965). But the Commissioner's rulings are not omnipotent. The Commissioner must keep his rulings within the boundaries of congressional intent. He can neither add to nor subtract from the intended congressional interpretation. General Electric Company v. Burton, 372 F.2d 108, 111 (6th Cir.1967).

In the immediate case there is no showing of bad faith on the part of Stockman. In circumstances such as these, the court looks to the substance of the transaction rather than the form. The shareholders of Denver voluntarily chose the method of forming a corporation to hold the shares of Stockman. The individual shareholders of the loss corporation, Denver, found sufficient means of protection by forming the new corporation, and there was also a suffi-

cient continuity of interest in the resulting corporation to protect the Denver shareholders. This court will not blind itself to the realities of the business world.

Laws are made for men of ordinary understanding, and should therefore be construed by the ordinary rules of common sense, and the use of such common sense leads this court to the inescapable determination that the business transaction between Stockman and Denver clearly falls within the purview of § 381 of the Internal Revenue Code and does not violate the intent of Congress when it set up certain limitations to § 381 by means of § 382. Therefore, Stockman is entitled to rightfully claim the loss carryovers by reason of its acquisition of all of the assets of Denver National Life Insurance Company.

The foregoing Memorandum Opinion shall constitute this court's findings of fact and conclusions of law.